Interadd of NH v. Foreign Motors     CV-94-560-SD  02/02/95

UNITED STATES DISTRICT COURT FOR THE

                          DISTRICT OF NEW HAMPSHIRE


<u>Interadd of New Hampshire, Inc.</u>


           v.                                   Civil No. 94-560-SD


<u>Foreign Motors, Inc.;</u>
<u>MBPA Corp.;</u>
<u>Herbert G. Chambers</u>


                            O R D E R


     In this diversity action, plaintiff Interadd of New

Hampshire, Inc., seeks to recover monies it is allegedly owed

under a Consulting and Non-Competition Agreement entered into

between Interadd and defendants Foreign Motors, Inc., and MBPA

Corporation, and guaranteed by defendant Herbert G. Chambers.

     Presently before the court are (1) defendants' motion to

dismiss this action for lack of personal jurisdiction or, in the

alternative, to dismiss or stay the action because of an

agreement to arbitrate, and (2) plaintiff's motion to file an

amended complaint.  Objections to each motion have been filed.


                          <u>Background</u>

     Prior to 1986, Lutz N. Wallem and his wife, Waltraud A.

Wallem, were the owners of Foreign Motors, Inc., an automobile dealership in Boston, Massachusetts, authorized to sell Mercedes-Benz, BMW, Porsche, and Audi automobiles.

In December 1985 Foreign Motors entered into an Asset Purchase Agreement with Bahig Bishay.  Pursuant to said agreement, Foreign Motors agreed to sell Bishay certain assets, including its four foreign car franchises.  Said agreement was contingent upon the franchisors' approval of the sale. Declaration of Herbert G. Chambers ¶ 3.[1]  In March 1986, Mercedes-Benz refused to approve the transfer of Foreign Motors' Mercedes-Benz franchise to Bishay.  Id.  As a result, Foreign Motors and Bishay entered into an Extension Agreement which gave Bishay an additional two years to obtain Mercedes-Benz's approval.  Id.

Defendant Herbert G. Chambers states,

> In September 1986, I was contacted on behalf of Foreign Motors and was informed that Foreign Motors was in serious financial difficulty and was threatened with loss of its inventory or "floor plan" financing, without any replacement financing in place. Bishay's dispute with Mercedes remained unresolved at this time.  I agreed to enter

---

[1]Chambers' "declaration" is an unsworn statement signed under penalty of perjury.  Under 28 U.S.C. § 1746, such a statement "may be used, in lieu of a sworn statement or affidavit" to support defendants' motion. Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 689 (1st Cir. 1993).

2

> into a series of agreements with Foreign
> Motors and the Wallems intended to address
> Foreign Motors' financial problems. I formed
> MBPA, a Massachusetts corporation, in
> connection with these transactions.

Id. ¶ 4.

On October 15, 1986, the following agreements were entered into with respect to Foreign Motors:

(1) a financing agreement under which MBPA agreed to loan $1,030,000 to Foreign Motors and to guarantee Foreign Motors' floor plan in exchange for 12½ percent of the dealership's stock;

(2) an Option to Purchase Stock Agreement (Defendants' Exhibit A) between the Wallems, Foreign Motors, and MBPA, under which MBPA or its designee received an option to purchase the remaining 87½ percent of Foreign Motors' stock; and

(3) an Indemnity Agreement between the Wallems, Foreign Motors, and MBPA (Defendants' Exhibit B) addressing, inter alia, the parties' responsibility for any expenses and liability associated with litigation involving Bishay.

MBPA subsequently exercised its option to purchase the remaining Foreign Motors stock owned by the Wallems, and named Chambers as its approved designee to receive transfer of the stock. See Memorandum Re: Tentative, Closing and Final Book Value at 1 (Defendants' Exhibit D). The sale of stock took place on November 6, 1987. Chambers Declaration ¶ 8.

3

In connection with this sale, Interadd, a New Hampshire corporation formed by the Wallems, entered into a Consulting and Non-Competition Agreement with Foreign Motors and MBPA (Defendants' Exhibit E) (the Consulting Agreement). Under said agreement, Interadd was to be paid $108,000 "each year for ten years payable monthly in arrears . . . ." Consulting Agreement at 1. In return, Lutz Wallem and Interadd agreed, inter alia, to provide consulting services to Foreign Motors and MBPA and not to compete with said companies over the ten-year period covered by the agreement. Id. at 1-2. Payment of the amounts due to Interadd under the Consulting Agreement was guaranteed by Chambers. See Guaranty of Non-Competition and Confidentiality Payments (Defendants' Exhibit F).

In December 1986 Bishay filed suit against the Wallems, Foreign Motors, MBPA, and Chambers in Massachusetts Superior Court. Chambers Declaration ¶ 7. Pursuant to the terms of the Indemnity Agreement, the Wallems are obligated to indemnify MBPA for a portion of the expenses incurred by MBPA as a result of this litigation. See Indemnity Agreement at 2-2(a). The Indemnity Agreement also grants MBPA and Foreign Motors the following right of offset:

> MBPA and/or the Company [Foreign Motors] shall have the right to offset any unpaid sum due under this Indemnity from the Indemnitors or either of them against the Five Thousand

4

> ($5,000.00) Dollars per week and the
> incentive bonus of 50% of the net operating
> profits otherwise due to the Indemnitors or
> either of them under the Wallem Employment
> Agreement and Wallem Consulting and Non-
> Competition Agreement of even date herewith,
> upon notice of offset to the Indemnitors.

Id. at 4.

Relying on this right of offset, the defendants subsequently offset amounts that were purportedly due to them under the Indemnity Agreement against the amounts due to Interadd under the Consulting Agreement. The Wallems disputed both the right of the defendants to make such an offset and the amount defendants claimed to be due under the Indemnity Agreement. Wallem Affidavit ¶ 13.

In an agreement dated March 12, 1993, the parties resolved their differences as to the offset issue and as to other related issues for all payments due under the various contracts between them prior to February 18, 1993. Said agreement provides, inter alia, that,

> The parties to this Agreement hereby agree
> that prior to any future offsets (after
> February 18, 1993) by MBPA or Foreign Motors,
> MBPA or Foreign Motors shall notify Interadd,
> in writing, of its intention to offset and
> shall furnish Interadd with detailed backup
> data of the amount to be offset. Interadd
> shall respond within ten (10) days of receipt
> of said written notice and data as to any
> offsets that are in dispute. Upon any
> dispute of the propriety and/or amount of
> offset the parties hereby agree to submit the

5

> dispute to a single arbitrator with said procedure being set forth in paragraph (15) fifteen of the Memorandum re: Tentative, Closing and Final Book Value of November 6, 1987. The terms and conditions of paragraph (15) fifteen of Memorandum re: Tentative, Closing and Final Book Value of November 6, 1987, are hereby incorporated herein by reference.[2]

Agreement of March 12, 1993, ¶ 7 (Defendants' Exhibit G).

By letter dated June 22, 1994, defendants notified Interadd and the Wallems of their intent "to offset amounts due under the Indemnity Agreement against amounts otherwise due under the November 6, 1987 Consulting and Non-Competition Agreement." Letter from Bruce H. Spatz to Interadd, Lutz N. Wallem, and Waltraud A. Wallem (Defendants' Exhibit H). The Wallems have challenged the amount due to defendants under the Indemnity

---

[2]Paragraph 15 of the November 6, 1987, Memorandum states,

> Single Arbitrator Procedure. Whenever any provision in this agreement requires arbitration before a single arbitrator, the Arbitrator shall be Wayne Shenk, currently General Manager of Foreign Motors, Inc., 1095 Commonwealth Avenue, Boston, Massachusetts. The sole remedy of the party shall be a single arbitrator proceeding, without appeal. Such arbitrator is to be totally independent, unconnected with any party hereto. (Such proceeding is herein referred to as "arbitration by a single arbitrator"). Each party shall pay their own attorneys' fees and both parties shall share equally the cost of the single arbitrator proceeding.

Memorandum of November 6, 1987, ¶ 15 (Defendants' Exhibit D).

6

Agreement and maintain that the Agreement of March 12, 1993, does not allow that amount to be offset against amounts due to Interadd under the Consulting Agreement.  In addition, by letter dated September 30, 1994, the Wallems requested that the dispute between the parties over the amount of indemnification be submitted to arbitration pursuant to paragraph seven of the March 12, 1993, Agreement and paragraph fifteen of the November 6, 1987, memorandum.  Letter from Earl L. Kalil, Jr., to Spatz (attached to Plaintiff's Objection as Exhibit 2(B)).

The instant action was initiated by Interadd in Rockingham County (New Hampshire) Superior Court on October 4, 1994. Defendants, citing a diversity of citizenship, removed the action to this court on November 1, 1994.

Discussion

A.  Personal Jurisdiction

"*[I]n personam* jurisdiction relates to the power of a court over a defendant.  It is of two varieties, general and specific." Pritzker v. Yari, Nos. 93-2374, 94-1128, 94-1129, ___ F.3d ___, ___, 1994 U.S. App. LEXIS 35101, at *10 (1st Cir. Dec. 13, 1994). Plaintiff asserts that this court has both general and specific personal jurisdiction over each of the named defendants.

1.  Burden of Proof

"[W]hen a court's personal jurisdiction over a defendant is contested, plaintiff bears the burden of demonstrating that such jurisdiction exists." Kopf v. Chloride Power Elecs., Inc., No. 94-391-SD, ___ F. Supp. ___, ___, 1995 U.S. Dist. LEXIS 384, at *22 (D.N.H. Jan. 12, 1994) (citing Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)).

A district court can elect to dispose of a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, provided that when it does so, it uses a "prima facie" standard to govern its review. United Elec. Workers v. 163 Pleasant Street Corp. [Pleasant Street II], 987 F.2d 39, 43 (1st Cir. 1993). Under this standard, plaintiff must make a prima facie showing of personal jurisdiction that is "based upon evidence of specific facts set forth in the record." Id. at 44 (citing Boit, supra, 967 F.2d at 675). Otherwise stated, "[t]his means that plaintiff '"must go beyond the pleadings and make affirmative proof."'" Id. (quoting Boit, supra, 967 F.2d at 675 (quoting Chlebda v. H.E. Fortna & Bro., Inc., 609 F.2d 1022, 1024 (1st Cir. 1979))).

In determining whether a plaintiff has made a prima facie jurisdictional showing, the court "draw[s] the facts from the pleadings and the parties' supplementary filings, including

8

affidavits, taking facts affirmatively alleged by plaintiff as true and construing disputed facts in the light most hospitable to plaintiff." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994). The court is not, however, required to "credit conclusory allegations or draw farfetched inferences." Id.

### 2. General Personal Jurisdiction

"General personal jurisdiction, as its name implies, is broad in its ambit: it is the power of a forum-based court, whether state or federal, over a defendant 'which may be asserted in connection with suits not directly founded on [that defendant's] forum-based conduct . . . .'" Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *10 (quoting Donatelli v. National Hockey League, 893 F.2d 459, 462-63 (1st Cir. 1990)). "'[G]eneral jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.'" Id. at *11 (quoting United Elec. Workers v. 163 Pleasant Street Corp. [Pleasant Street I], 960 F.2d 1080, 1088 (1st Cir. 1992)); see also Glater v. Eli Lilly & Co., 744 F.2d 213, 216-17 (1st Cir. 1984).

The contacts unrelated to this suit cited by plaintiff consist of advertising in the Boston Globe, which is distributed in New Hampshire, and the selling of automobiles to and providing automobile service for New Hampshire residents. Lutz Affidavit ¶¶ 8-9; Affidavit of Richard F. Collins ¶¶ 2-4; Affidavit of Joan E. Skewes ¶¶ 1-3.

Having reviewed the nature of defendants' contacts with New Hampshire, the court finds that said contacts are not the type of "continuous and systematic" contacts that would allow the court to assert general jurisdiction over the defendants. See, e.g., Glater, supra, 744 F.2d at 217 (advertising and solicitation of product orders by defendants in New Hampshire not sufficient to support exercise of general jurisdiction over defendants).

### 3. Specific Personal Jurisdiction

"The proper exercise of specific in personam jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *12. See also Ticketmaster, supra, 26 F.3d at 204; Pleasant

Street II, supra, 987 F.2d at 43.


        4.  The Long-Arm Statutes

            a.  The Corporate Defendants

    Foreign Motors and MBPA are both Massachusetts corporations.
They are not authorized to transact business in New Hampshire,
nor do they maintain a registered agent here.  Chambers
Declaration ¶ 11.

    The long-arm statute governing the jurisdiction of New
Hampshire courts over unregistered foreign corporations is New
Hampshire Revised Statutes Annotated (RSA) 293-A:15.10.[3]  McClary
v. Erie Engine & Mfg. Co., 856 F. Supp. 52, 55 (D.N.H. 1994).
When the New Hampshire Legislature enacted RSA 293-A:15.10, it

_____

    [3]RSA 293-A:15.10 provides, in relevant part,

        (b) A foreign corporation may be served by
        registered or certified mail, return receipt
        requested, addressed to the secretary of the
        foreign corporation at its principal office
        shown in its application for a certificate of
        authority or in its most recent annual report
        if the foreign corporation:
            (1) has no registered agent or its
            registered agent cannot with reasonable
            diligence be served;
            .  .  .  .
        (d) This section does not prescribe the
        only means, or necessarily the required
        means, of serving a foreign corporation.

RSA 293-A:15.10(b) and (d) (Supp. 1993).

11

eliminated all of the restrictive long-arm language that had appeared in the statute's predecessors. In so doing, this court has held that the legislature "intended RSA 293-A:15.10 to authorize jurisdiction over foreign corporations to the full extent allowed by federal law." Id.

"Because RSA 293-A:15.10 reaches to the federal limit, the traditional two-part personal jurisdiction inquiry collapses into the single question of whether the constitutional requirements of due process have been met." Id. Accordingly, this court's exercise of jurisdiction over Foreign Motors and MBPA is authorized by RSA 293-A:15.10 if it comports with the requirements of due process.

### b. Herbert G. Chambers

The long-arm statute applicable to defendant Chambers is RSA 510:4, which provides,

> I. JURISDICTION. Any person who is not an inhabitant of this state and who, in person or through an agent, transacts any business within this state, commits a tortious act within this state, or has the ownership, use, or possession of any real or personal property situated in this state submits himself, or his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from or growing out of the acts enumerated above.

RSA 510:4, I (1983). The New Hampshire "legislature intended RSA

12

510:4, I, 'to be construed in the broadest legal sense to encompass personal, private and commercial transactions.'" Phelps v. Kingston, 130 N.H. 166, 170, 536 A.2d 740, 742 (1987) (quoting Leeper v. Leeper, 114 N.H. 294, 297, 319 A.2d 626, 628 (1974)). Accordingly, the statute is applied "to provide jurisdiction over foreign defendants to the full extent that the statutory language and due process will allow." Id., 130 N.H. at 171, 536 A.2d at 742.

Because RSA 510:4 reaches to the constitutional limit, the court confines its analysis here to the question of whether its exercise of personal jurisdiction over the defendant Chambers comports with the requirements of due process. See, e.g., McClary, supra, 856 F. Supp. at 55; Ganis Corp. of California v. Jackson, 822 F.2d 194, 196 (1st Cir. 1987).


3.  The Requirements of Due Process

A court's exercise of personal jurisdiction over a non-resident defendant meets the requirements of due process if the court finds that the defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

13

In determining whether its exercise of jurisdiction falls "within constitutional bounds," the court employs the following tripartite analysis:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *14-15 (quoting Pleasant Street I, supra, 960 F.2d at 1089).

### a. Relatedness

The requirement that an action arise out of or relate to a defendant's forum-state contacts serves two functions.

> First, relatedness is the divining rod that separates specific jurisdiction cases from general jurisdiction cases. Second, it ensures that the element of causation remains in the forefront of the due process investigation. Even if the facts are such that a court may not dismiss a given case for lack of relatedness *per se*, the relatedness requirement, in serving its second function, authorizes the court to take into account the strength (or weakness) of the plaintiff's relatedness showing in passing upon the fundamental fairness of allowing the suit to proceed.

14

<u>Ticketmaster</u>, <u>supra</u>, 26 F.3d at 207.

The court's examination of defendants' contacts with the forum begins with the Consulting Agreement between Foreign Motors, MBPA, and Interadd,[4] and the guarantee of payments due to Interadd under that agreement by Chambers.

However, a defendant's contract with an out-of-state party, standing alone, does not automatically establish sufficient minimum contacts in the other party's home forum for the purposes of due process analysis.  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 478 (1985); <u>Ganis Corp.</u>, <u>supra</u>, 822 F.2d at 197. Instead, the court, applying a "contracts-plus" analysis, must also examine "all of the communications and transactions between the parties, before, during and after the consummation of the contract, to determine the degree and type of contacts the defendant has with the forum, apart from the contract alone." <u>Ganis Corp.</u>, <u>supra</u>, 822 F.2d at 197-98.  This approach "recognizes that a 'contract' is 'ordinarily but an intermediate

---

[4]Lutz Wallem states that "[t]he purpose of the formation of Interadd . . . was the transaction and performance of the various contracts and agreements among the parties to this litigation." Affidavit of Lutz Wallem ¶ 2.  Wallem further states that Interadd was formed "at the request and direction of" defendant Chambers.  <u>Id.</u> ¶¶ 1-2; Second Affidavit of Lutz N. Wallem ¶ 2. Chambers contends that he "never made any such request . . . ." Second Declaration of Herbert G. Chambers ¶ 3.  The court finds this dispute over the formation of Interadd to be immaterial to the questions before it at this time.

15

step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" Burger King, supra, 471 U.S. at 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316-17 (1943)). "It is these factors--prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing--that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." Id.

With respect to the negotiations between the parties prior to consummation of the Consulting Agreement, Lutz Wallem asserts that in September of 1986, "Mr. Chambers traveled to Lebanon, New Hampshire to negotiate the contracts and agreements with me in person. At that time Mr. Chambers traveled to Lebanon, New Hampshire by means of his helicopter to negotiate the terms of the Option To Purchase Stock and the Indemnity Agreement, both dated October 15, 1986." Wallem Affidavit ¶ 5. The Option to Purchase Stock Agreement negotiated between the parties provided that, at the closing of the sale of stock from the Wallems to MBPA or its designee, the parties "shall execute the Consulting and Non-Competition Agreement." Option to Purchase Stock Agreement at 8. Said agreement further provides that Lutz Wallem, the consultant, shall be paid an initial consulting fee

16

of $500,000 at the closing and shall be paid the monthly payment under the Consulting and Non-Competition Agreement for 120 months after the execution of such agreement. Id. at 8-9. The Consulting Agreement is also referenced in the Indemnity Agreement. See Indemnity Agreement at 4.

Chambers states that he "did not travel to New Hampshire in connection with the negotiation or execution of the November 6, 1987 closing documents and agreements." Chambers Declaration ¶ 9. Plaintiff does not dispute Chambers' claim that he did not travel to New Hampshire to negotiate the terms of the Consulting Agreement and Guaranty, but asserts that during the negotiation of the November 6, 1987, contracts defendants "had numerous and varied forms of communication with [Wallem] and Interadd in New Hampshire" including "various correspondence and numerous telephone contacts made by Mr. Chambers and his and the co-defendants' representatives with [Wallem] and Interadd in New Hampshire . . . ." Wallem Affidavit ¶¶ 4-5.

The closing at which the Wallems' remaining stock in Foreign Motors was sold to Chambers and at which the Consulting Agreement was signed took place at the offices of Chambers' counsel, Milton Sorokin, in Hartford, Connecticut. Second Declaration of Bruce H. Spatz ¶ 8.

Under the terms of the Consulting Agreement, Interadd and

17

Lutz Wallem were to provide consulting services to Foreign Motors

and MBPA for a ten-year term.  With respect to performance of the

Consulting Agreement, Wallem states in his affidavit, "I have

been contacted in New Hampshire as the representative of Interadd

for consultation and advice relating to sales, service and

business administration.  I provided this performance on behalf

of Interadd from the State of New Hampshire."  Wallem Affidavit ¶

6.  Wallem further states,

> The performance of Interadd's services
> would regularly occur with my being contacted
> in New Hampshire to discuss matters having to
> do with financial records, warranties and
> other managerial matters concerning the
> operation of Foreign Motors, Inc. after
> Foreign Motors, Inc. was bought out and taken
> over by Mr. Chambers and his companies.
> Interadd of New Hampshire, Inc.'s status as a
> consultant after Mr. Chambers took over is
> that Interadd is on standby, in New
> Hampshire, for telephonic communication of
> matters on which they might need continuing
> consultation on matters having to do with the
> ongoing operations.  In performing such work
> as a consultant I have traveled to
> Massachusetts on behalf of Interadd on
> occasion.  However, it has nearly always been
> the case that Interadd and myself are
> contacted in New Hampshire and perform the
> requested consultation over the telephone
> from New Hampshire also based on records
> located at the offices of Interadd in New
> Hampshire.

Second Affidavit of Lutz N. Wallem ¶ 6 (attached to Plaintiff's

18

Response as Exhibit 1).[5]

"The location of where payments are to be sent has been recognized as a material contact in jurisdictional analysis." Ganis Corp., supra, 822 F.2d at 198 (citing Burger King, supra, 471 U.S. at 480-81. Plaintiff asserts that fees due under the Consulting Agreement were to be paid to Interadd in New Hampshire. Wallem Affidavit ¶ 7. Defendants concede that "[o]n limited occasions, checks may have been mailed to Wallem" in New Hampshire, but maintain that "[a]lmost all checks for payments made by Foreign Motors under the Consulting Agreement were picked up in Massachusetts." Declaration of Bruce H. Spatz ¶ 6.

Further, all notices under the agreement are to be sent to Interadd in New Hampshire, with a copy to C. Michael Malon, Esq., of Davis, Malon & D'Agostine in Boston, Massachusetts. Consulting Agreement at 6-7.

On the basis of all the evidence before it, the court finds that there is a substantial connection between defendants' contacts in the forum and the instant cause of action.

_____

[5]The court notes that Chambers states in his declaration that "[a]ll consulting services rendered under [the Consulting and Non-Competition Agreement] have taken place in Boston." Chambers Declaration ¶ 9. However, in determining whether plaintiff has made a prima facie showing of jurisdiction, the court is required to "constru[e] disputed facts in the light most hospitable to plaintiff." Ticketmaster, supra, 26 F.3d at 203.

19

### b. Purposeful Availment

The second prong of the tripartite analysis requires the court to determine whether defendants' in-state contacts, described <u>infra</u> at pp. 15-20, represent a purposeful availment of the privilege of conducting activities in New Hampshire. <u>Pritzker</u>, <u>supra</u>, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *15-16. This requirement ensures "'that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person" . . . .'" <u>Donatelli</u>, <u>supra</u>, 893 F.2d at 464-65 (quoting <u>Burger King</u>, <u>supra</u>, 471 U.S. at 475).

The court finds that defendants, by entering into a contract with a New Hampshire resident that would be performed, at least in part, in New Hampshire over a ten-year period, purposely availed themselves of the privilege of conducting business in New Hampshire. <u>See</u> <u>McGee v. International Life Ins. Co.</u>, 355 U.S. 220, 223 (1957) ("It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State.").

### c. The Gestalt Factors

The Gestalt factors identified by the First Circuit include:

20

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *26 (quoting Pleasant Street I, supra, 960 F.2d at 1088). The court notes that said factors "'are not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice. In very close cases, they may tip the constitutional balance.'" Id. at *27 (quoting Ticketmaster, supra, 26 F.3d at 209).

### (1) Defendants' Burden of Appearing

The First Circuit, recognizing that "the concept of burden is inherently relative," has held that "insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly, . . . this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *27.

Defendants Foreign Motors and MBPA are Massachusetts corporations with their principal places of business located in

21

Somerville, Massachusetts, and Hartford, Connecticut, respectively. Defendant is a Connecticut resident, but clearly conducts a great deal of his business in the Boston area. The court finds that the burden that would be placed on the defendants by requiring them to appear before this court in Concord, New Hampshire, is minimal.

### (2) The Forum State's Interest

The action arises from a contract between a New Hampshire resident and several nonresident defendants. New Hampshire clearly has an interest in exercising jurisdiction over nonresident defendants who are alleged to have breached such a contract. See, e.g., Haverhill v. City Bank and Trust Co., 119 N.H. 409, 411-12, 402 A.2d 185, 187 (1979) (exercising jurisdiction over a nonresident defendant whose contract with a resident was to be partially performed in New Hampshire).

### (3) The Plaintiff's Convenience

Interadd is currently located in Stratham, New Hampshire. Stratham is located in the southern part of the state and, as a practical matter, is not much further from the federal court in Boston than it is from this court. Therefore, "[w]hile [the court] must accord plaintiff's choice of forum a degree of

deference in respect to the issue of its own convenience, <u>see</u> <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 241 (1981), the plaintiff's *actual* convenience seems to be at best a makeweight in this situation." <u>Ticketmaster</u>, <u>supra</u>, 26 F.3d at 211.

### (4) The Administration of Justice

The judicial system has a clear interest in obtaining the most effective resolution of any controversy. <u>Ticketmaster</u>, <u>supra</u>, 26 F.3d at 209. The court finds that its determination of what constitutes the most effective resolution of this controversy requires it to consider the interrelationship between the Consulting Agreement and the numerous other agreements between the various parties.

The controversy at issue is whether defendants owe money to Interadd under the Consulting Agreement. Taken at face value, this dispute appears to be a relatively simple one to resolve. However, there is an ongoing dispute between the parties as to whether defendants are entitled to offset amounts due under the Indemnity Agreement against amounts due under the Consulting Agreement. The parties are also in dispute over the amount due under the Indemnity Agreement and are both seeking to have that dispute submitted to arbitration in accordance with their Agreement of March 12, 1993, and the arbitration provision set

23

forth in their Memorandum of November 6, 1987.[6]

The court finds that these three disputes are all interrelated and that the most effective resolution of the controversy at issue is one that also resolves the other two disputes described herein.  See, e.g., Pritzker, supra, ___ F.3d ___, 1994 U.S. App. LEXIS 35101, at *29 ("the judicial system's interest in obtaining the most efficacious resolution of the controversy . . . counsels against furcation of the dispute among several different jurisdictions").  The court does not find, however, that this factor counsels against exercising jurisdiction over the defendants at this time.

### (5) Pertinent Policy Arguments

The parties have not identified any specific substantive social policies that counsel for or against exercising jurisdiction over defendants in this matter.  The court notes that all sovereigns share a general interest in requiring parties to resolve all of their related disputes in a single forum and at a single time rather than engaging in protracted litigation in several different forums that will necessarily interfere with one another.

---

[6]Defendants have notified the court that on January 18, 1995, they filed a complaint in Massachusetts Superior Court seeking to compel arbitration of said dispute in Massachusetts.

24

Although the court views this policy as important to the court's ultimate determination as to how to proceed with this action, the policy does not counsel against exercising jurisdiction over the defendants at this time.

### d. Summarizing the Specific Personal Jurisdiction Analysis

In order for a court to exercise specific personal jurisdiction over an out-of-state defendant, there must exist a logical nexus between "the defendant, the forum, and the litigation." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984). As set forth herein, the court finds that plaintiff's claims relate to defendants' contacts with the forum and that the nature of defendants' contacts with the forum made it reasonably foreseeable that defendants would be haled into court here. The court further finds, in light of the Gestalt factors discussed herein, that its exercise of jurisdiction over the defendants does not offend traditional notions of fair play and substantial justice. The court therefore finds that it has specific personal jurisdiction over the defendants.

### B. Stay Pending Arbitration

Defendants move, in the alternative, "to dismiss or stay

25

this action on the grounds that the parties have agreed to arbitrate the dispute raised by the complaint." Defendants' Motion at 1.

The complaint filed by plaintiff asserts that defendants have failed to pay amounts due to Interadd under the Consulting Agreement. The arbitrability of this dispute "turns on the interpretation of contractual terms, a question of law which [the court] can determine in the first instance." Commercial Union Ins. Co. v. Gilbane Bldg. Co., 992 F.2d 386, 388 (1st Cir. 1993). In making this determination, the court is cognizant of "the strong federal policy favoring arbitration agreements, a policy which requires [courts] to resolve 'any doubts' concerning arbitrability in favor of arbitration." Id.; see also Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer, 29 F.3d 727, 730 (1st Cir.) ("Where there is an agreement to arbitrate, the [Federal Arbitration Act, 9 U.S.C. § 1, et seq.] reflects a strong, well-established, and widely recognized federal policy in favor of arbitration."), cert. granted, 115 S. Ct. 571 (1994).

Defendants contend that the parties agreed to arbitrate disputes such as the one raised in the complaint in their Agreement of March 12, 1993. Said agreement provides, in relevant part, that "[u]pon any dispute of the propriety and/or amount of offset the parties hereby agree to submit the dispute

26

to a single arbitrator" in accordance with the procedure set forth in paragraph 15 of the parties' Memorandum of November 6, 1987, which is incorporated into their Agreement of March 12, 1993, by reference. Agreement of March 12, 1993, at 3 (relevant provision quoted in full at page 5-6 of this order).

As a preliminary matter, the court finds that the question of whether defendants owe any amount to Interadd under the Consulting Agreement is separate and distinct from the question of whether defendants may offset said amount against amounts the Wallems allegedly owe the defendants under the Indemnity Agreement. Therefore, although any dispute over "the propriety and/or amount of offset" is clearly subject to arbitration under the terms of the March 12, 1993, Agreement, the court finds that the dispute raised in the complaint over amounts due under the Consulting Agreement is not.

Second, defendants filed their motion to dismiss for lack of personal jurisdiction as a pre-answer motion. Accordingly, the disputes they raise regarding offset and amounts due to them under the Indemnity Agreement are not yet before this court as affirmative defenses or counterclaims. Defendants' motion to stay this action pending arbitration of said disputes is

27

therefore premature.[7]


## C.  Plaintiff's Motion for Leave to File Amended Complaint

Plaintiff requests leave to file an amended complaint that is "in the form of a Federal Court Complaint and stating additional or different claims."  Plaintiff's Reply ¶ 2.

Rule 15(a) permits a party to amend its pleading "once as a matter of course at any time before a responsive pleading is served . . . ."  Rule 15(a), Fed. R. Civ. P.  No responsive pleading has been filed by the defendants, who opted instead to file a pre-answer motion to dismiss.  Therefore, Rule 15(a) permits plaintiff to file an amended complaint.  As requested in its motion, plaintiff shall have twenty days from the date of this order in which to file its amended complaint.

_____

[7]The court does not reach the question of whether the arbitration provision set forth in the Agreement of March 12, 1993, is, as defendants contend, governed by Massachusetts law.

<u>Conclusion</u>

For the reasons set forth herein, defendants' motion to dismiss (document 4) is denied and plaintiff's motion for leave to file an amended complaint (document 6) is granted.

SO ORDERED.

 

_____
Shane Devine, Senior Judge
United States District Court

February 2, 1995

cc:   Ralph R. Woodman, Jr., Esq.
      Ronald L. Snow, Esq.